UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        v.<br><br>MAHMOOD SAMI KHAN,<br> aka "SAMI," and<br>SUHAIB AHMAD CHAUDHRY | No. 25 CR 321<br><br>Judge Sharon Johnson Coleman |

**GOVERNMENT'S *SANTIAGO* PROFFER SUPPORTING THE
ADMISSIBILITY OF COCONSPIRATOR STATEMENTS**

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, submits this proffer, pursuant to Federal Rule of Evidence 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), of the government's evidence supporting the admission of coconspirator statements at trial, to the extent any are offered on that basis.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:    *s/Kelly Guzman*
KELLY GUZMAN
DIANE MACARTHUR
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
312-353-5300

**TABLE OF CONTENTS**

I. Introduction ........................................................................................ 1

II. Governing Law ................................................................................. 2

    A. Use of Santiago Proffer ......................................................... 2

    B. Admissibility of Coconspirator Statements............................. 3

        1. Existence of and Membership in the Conspiracy ......................... 3

        2. The "In Furtherance of" Requirement ......................................... 6

    C. Absence of Confrontation Clause Issues with Coconspirator Statements............................................................... 8

    D. Alternative Bases for Admissibility......................................... 9

III. Evidence Demonstrating the Existence of the Charged Conspiracies and Defendants' Participation in the Conspiracies .............................. 10

IV. Coconspirator Statements...................................................... 29

V. Conclusion ..................................................................................... 32

i

## I.    Introduction

Between March 2020 and March 2022, the Health Resources Services Administration ("HRSA") reimbursed laboratories for performing PCR COVID-19 tests. Beginning in approximately April 2021 and continuing through June 2022, Anosh Ahmed, formerly the Chief Operating Officer of Hospital A, worked with defendants Mahmood Sami Khan, Suhaib Chaudhry, and Mohammed Sirajudeen ("Siraj"), to bill HRSA for over $890 million in COVID tests that had not actually been performed, and then, between August 2021 and January 2023, engaged in financial transactions that were designed to spend and conceal the proceeds of that scheme.[1] For this conduct, Khan and Chaudhry are charged with conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(1) and 1957. Defendant Khan is also charged in a scheme to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the charged conspiracies, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *Santiago*, 582 F.2d at 1130-31, and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Individual A*, 585 F.3d 394, 398, 400 (7th Cir. 2009).

---

[1] The government will provide defendants, and the Court upon request, with a key reflecting the names associated with the anonymized entities and individuals referenced in this submission.

This submission does not detail all of the government's evidence that would establish the existence of the conspiracies or all of the coconspirator statements that were made in furtherance of the charged conspiracies. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the conspiracies described in Counts Seven, Eight, Eleven, and Thirteen (the wire fraud counts involving Khan) and Nineteen (the money laundering conspiracy involving Khan and Chaudhry). As a result, this submission does not identify all of the government's witnesses, nor does it provide all of the evidence that will be presented by identified witnesses. Finally, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

## II.    Governing Law

### A.    Use of the *Santiago* Proffer

In *Santiago,* the Seventh Circuit held that, under FRE 104(a), the trial judge is responsible for making the preliminary determination of the admissibility of coconspirator statements and retains flexibility in how that determination is made. 582 F.2d at 1131. The court recognized "that the trial judge retains the option of conditionally admitting the coconspirator declaration evidence before the conspiracy has been independently established, but subject to the subsequent fulfillment of that critical condition." *Id.* The Seventh Circuit later outlined the various options a trial judge has in fulfilling its gatekeeping obligation under Rule 104(a), one of which entails the government providing a pretrial "preview" of the evidence of the conspiracy, *United States v. Cox,* 923 F.2d 519, 526 (7th Cir. 1991), while another

2

would entail the trial court "conditionally admit[ting] the body of coconspirator's statements subject to the Government's eventual proof of the foundational elements (the penalty for not so proving being a possible mistrial)." *Id.*; s*ee also United States v. Bey*, 725 F.3d 643, 647 (7th Cir. 2013) (noting that the purpose of a *Santiago* proffer is to "help[] streamline trials"). Accordingly, while the government submits that its proffer, as set forth below, is more than sufficient to support the conditional admission of any coconspirator statements, the Court retains maximum flexibility to make its admissibility determinations after seeing and hearing all the evidence.

## B. Admissibility of Coconspirator Statements

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the person making the cited statements were members of the particular conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Westmoreland,* 312 F.3d 302, 309 (7th Cir. 2002).

### 1. Existence of and Membership in the Conspiracy

While the court may consider the proffered coconspirator statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, *Bourjaily*, 483 U.S. at 178, 180, there must also be some supporting evidence or corroborating facts. *United States v. Individual A*, 585 F.3d at 398-99.

3

The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[2]

There is no requirement that the government establish all elements of "conspiracy," such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550.

While there is a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir.

---

[2] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted and thus does not constitute "hearsay" as defined by Rule 801(c). Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See* discussion of alternative bases of admissibility, *infra* Section II.D. at9-10.

2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracies. *United States v. Curtis,* 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator or schemer. *Longstreet,* 567 F.3d at 919; *Jones,* 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble,* 754 F.2d 1324, 1329 (7th Cir. 1985); *see United States v. Handlin,* 366 F.3d 584, 590 (7th Cir. 2004) ("[I]t is irrelevant when the defendant joined the conspiracy, so long as he joined it at some point."). A coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie,* 900 F.2d 1064, 1074 (7th Cir. 1990). A conspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Maloney,* 71 F.3d 645, 654–55 (7th Cir. 1995).

The government is not required to prove the identity of the declarant of the coconspirator statement; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar,* 532 F.3d 599, 604 (7th Cir. 2008).

Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was a coconspirator. *Id.*

### 2. The "In Furtherance of" Requirement

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See United States v. Cruz-Rea,* 626 F.3d 929, 937 (7th Cir. 2010); *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be in furtherance of the conspiracy. *Cruz-Rea*, 626 F.3d at 937–38. The "coconspirator's statement need not have been exclusively, or even primarily, made to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (internal quotations and citations omitted).

A wide range of statements satisfy the "in furtherance" requirement. *See United States v. Cozzo*, No. 02 CR 400, 2004 WL 1151630, at *2–3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role satisf[ies] the in furtherance requirement." *Alviar*, 573 F.3d at 545 (internal quotations and citations omitted); *see also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

    a.    to conduct or help to conduct the business of the scheme and accomplish its goals, *Cox*, 923 F.2d at 527; *see also Johnson*, 200 F.3d at 533;

6

b. to prompt the listener to act in a manner that facilitates the carrying out of the conspiracy, *see United States v. Monus*, 128 F.3d 376, 392-93 (6th Cir. 1997);

c. to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

d. to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

e. as an assurance that a coconspirator can be trusted to perform his role, *Sophie*, 900 F.2d at 1073-74; *United States v. Buishas*, 791 F.2d 1310, 1315 (7th Cir. 1986);

f. to inform and update others about the current status of the conspiracy or a conspiracy's progress (including both failures and successes), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545; *United States v. Pallais*, 921 F.2d 684, 688 (7th Cir. 1990) ("The exchange of information is the lifeblood of a conspiracy . . ." including "commenting on a failed operation" and identification of a coconspirator by nickname.);

g. to control damage to an ongoing conspiracy, *Johnson,* 200 F.3d at 533; *United States v. Molinaro,* 877 F.2d 1341, 1343-45 (7th Cir. 1989) (admitting statements between conspirators complaining about a third conspirator's handling of delivery and payment for narcotics)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

h. to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also Maloney*, 71 F.3d at 659-60;

i. to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073 (admitting statements describing a defendant's past drug deals); *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989) (admitting the statement to

defendant "We're going to take care of him," which arguably encouraged defendant to perform his task);

j.   to recruit potential members of the conspiracy, *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987);

k.   to report a conspirator's status and receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513, 524 (7th Cir. 2008); and

l.   "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992).

Finally, any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720, 722 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 F. App'x 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

**C.   Absence of Confrontation Clause Issues with Coconspirator Statements**

Only "testimonial" statements implicate the Confrontation Clause, *Crawford v. Washington,* 541 U.S. 36 (2004), and a statement made in furtherance of a conspiracy is, by definition, not a testimonial statement. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (rejecting confrontation clause claim as to introduction of coconspirator statements because such statements are not testimonial); *United States v. Hargrove*, 508 F.3d 445, 448 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

Further, even if a hearsay statement does not qualify for admission under Rule 801(d)(2)(E), or any other hearsay exception, that fact alone would not create a Confrontation Clause issue because, again, only testimonial statements implicate the right to confront a witness. *Crawford,* 541 U.S. at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as . . . would an approach that exempted such statements from Confrontation Clause scrutiny altogether."); *see also Volpendesto*, 746 F.3d 273, 289 (7th Cir. 2014) ("[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes.").

### D. Alternative Bases for Admissibility

Statements made during the course of a conspiracy may be admissible independent of Rule 801(d)(2)(E), even if they are also admissible under Rule 801(d)(2)(E).

A defendant's own statements are not hearsay by definition and, if otherwise relevant, are admissible pursuant to Rule 801(d)(2)(A). Moreover, such statements are relevant to establishing the factual predicates for the admission of coconspirator statements against him. *See United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987); *United States v. Ginsburg*, 773 F.2d 798, 802 (7th Cir. 1985). Additionally, of course, a coconspirator statement may also independently be admissible as an exception to hearsay under Rule 803, most notably as a statement of the declarant's plans or intentions or a statement explaining an event immediately after the declarant perceived it. F.R.E. 803(1) and (3).

9

Moreover, a statement that is not being offered for the truth of the matter asserted, including so-called verbal "acts" or other comments that are not subject to verification, such as directions, orders, suggestions, or questions, do not constitute hearsay. *See United States v. Tuchow*, 768 F.2d 855, 869 n.18 (7th Cir. 1985). Similarly, statements offered to show the existence, the illegality, or the nature or scope of the charged scheme or conspiracy are not offered for their truth and may thus be admitted against a defendant without establishing the *Bourjaily* factual predicates. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant was out of cocaine was not hearsay because it was not offered for its truth but as evidence of membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) ("war stories" about the drug trade were not offered for the truth); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value in establishing knowledge of and membership in conspiracy); *Tuchow*, 768 F.2d at 867-69 (pre-conspiracy statements admissible to set forth scope of the anticipated conspiratorial scheme).

### III. Evidence Demonstrating the Existence of the Charged Conspiracies and Defendants' Participation in the Conspiracies

At trial, the government's evidence will establish that, between April 2021 and June 2022, Khan, Ahmed, and Siraj participated in a scheme to bill HRSA for hundreds of millions of dollars of COVID testing through several labs in Chicago and

Texas that had not actually performed that testing.[3] Upon receipt of the ill-gotten HRSA proceeds, between August 2021 and January 2023, Khan, Chaudhry and Ahmed conspired with each other to launder the proceeds by engaging in financial transactions designed to spend and conceal the funds.

**Overview of Chicago Conduct**

In March 2021, after Ahmed resigned from his position as Chief Financial Officer and Chief Operating Officer at Hospital A, Ahmed asked Hospital A employees Cooperator A[4] (Chief Executive Officer) and Individual F (Chief Transformation Officer) to send him lists of patient identifying information from Hospital A's patient database, which they did. Ahmed intended to, and did, use this patient information to bill HRSA for his own gain. To that end, in approximately May 2021, Ahmed and Sameer Suhail, who owned over 25 different companies that provided, or purported to provide, services to Hospital A, began working with Lab B. Ahmed and Suhail met with Lab B's biller, Individual A. During this meeting, despite the fact that Ahmed had resigned from employment at Hospital A, and that Suhail did not serve as a physician at Loretto, Ahmed and Suhail purported to be doctors at Loretto. In reality, Hospital A already had a contract with Lab B for COVID testing, and Hospital A employees, not Ahmed, were collecting the samples, transmitting them to the lab, and receiving payment from the lab on Loretto's contract.

---

[3] Defendant Chaudhry is not charged in the scheme to defraud HRSA described in Counts One through Fourteen of the indictment. R. 1. Chaudhry is only charged in the money laundering conspiracy in Count Nineteen of the indictment. *Id.*

[4] Cooperator A is a defendant in a related but separate case charged in the Northern District of Illinois.

In June 2021, Ahmed asked Individual A to find another lab to work with. Individual A connected Ahmed to Siraj at O'Hare Clinical Labs ("OCL"), and Ahmed and Siraj entered a contract for OCL to perform COVID testing and billing for patient specimens that Ahmed submitted. Around the same time period, Ahmed introduced Individual A to Khan and Chaudhry, who told Individual A they did marketing and ran testing sites for Ahmed.

In June 2021, Ahmed started sending COVID specimens to OCL. Individual L and others transported boxes of specimens to the lab for testing. At the same time, Ahmed transmitted patient identifiers to the lab for entry into the lab's computer software system (the "Laboratory Information System," or "LIS"). Individual A re-formatted the data in the patient identifiers to make it compatible with LIS and then transmitted the reformatted patient identifiers to OCL.

The patient identifiers submitted to Individual A, and subsequently to OCL, came from a variety of sources. For example, Khan ran a Shopify website where individual users could order home test kits. Khan transmitted the identifiers of people who ordered test kits from his Shopify site to Individual A, for billing at OCL. Ahmed also engaged individuals to collect patient identifiers by going door-to-door and passing out home test kits and information on COVID testing, and by setting up booths at large events. Chaudhry also engaged a marketing firm to facilitate these door-to-door efforts in Texas. Chaudhry paid the individuals who collected patient identifiers and distributed home test kits through his company, Advertix.

12

The claims submitted by OCL for reimbursement through HRSA, however, also included the majority of the names on the Hospital A patient lists transmitted to Ahmed by Cooperator A and Individual F. The data from these patient lists was manipulated to create a larger volume of claims. For example, in many cases, the patient demographic fields were scrambled, so that patients on the list appeared with multiple different dates of birth or a different gender, or with last and first names reversed, or with multiple different addresses. Some addresses from the Hospital A patient lists were listed for multiple different patients.

Once Individual A formatted and transmitted patient information to OCL, Siraj and OCL employees entered the information into LIS. On those occasions when OCL received actual physical specimens, OCL employees matched the patient information on the requisition form accompanying the specimen to the patient information in the LIS, printed a label for the specimen, and ran the test. Individual C, the medical biller for OCL, billed completed tests shown by the LIS data. If the patient was insured, Individual C billed the insurance carrier; if not, he billed HRSA. Contemporaneously, OCL reported the results for completed tests to patients and to the Illinois Department of Public Health ("IDPH").

The samples submitted by Ahmed's collectors, however, were distinct from other collectors in one significant way: 100% of the results on actual samples submitted were negative, and 100% of the individuals were uninsured. Moreover, by using the scrambled patient lists, OCL billed HRSA for purported COVID testing for many more tests than they actually ran. On or about June 21, 2021, Siraj directed

13

Individual C to bill directly from the spreadsheets of patient information submitted by Individual A, rather than from the LIS data, which reflected completed tests. This enabled Individual C to bill HRSA for tests regardless of whether they had actually been run by the lab. Individual N, a lab employee at OCL, reported that based on the number of machines the lab had and the number of tests they could process at a time, at most the lab could run 3-5,000 samples per day shift. Individual N believed the night shift ran fewer tests than the day shift. Nevertheless, OCL's claims to HRSA purported to have run over 30,000 PCR tests on August 11, 2021—a single day—on Ahmed-related samples alone.

These high numbers did not escape notice. In July 2021, an employee of the Illinois Department of Public Health ("IDPH") sent an email to OCL employees questioning the number of tests OCL reported.[5] According to a Chicago Department of Public Health employee, OCL reported greater than 12,000 tests on June 12, 2021. On the same day, only 14,764 tests were conducted across the entire City, meaning OCL was reporting to have performed 84% of all the COVID testing in the city. Individual F, who had provided Ahmed with Hospital A patient lists after Ahmed's termination, falsely responded that the tests were "offsite testing" performed by Hospital A. In fact, however, Hospital A was not performing an extremely high volume of "offsite testing;" it was not working with Ahmed to collect OCL's patient samples; and it was not sending them to OCL or receiving any payment from OCL.

---

[5] OCL was required to submit data to IDPH during the COVID period.

In total, OCL submitted claims to HRSA in which OCL purported to have tested over 1.3 million patient specimens, and, based on these false claims, HRSA issued over $200 million in reimbursement. In September 2021, HRSA ceased reimbursements to OCL for a reason related to OCL's ownership.

**Overview of Texas Conduct**

Between approximately November 2021 and March 2022, Ahmed, Khan, Chaudhry, and Individual F submitted claims to HRSA through several labs in Texas, including Lab A, Summer Diagnostics, Softland, Apollo, and Artemis[6]. In this case, with these Texas labs, Ahmed invested in or purchased them, rather than entering into a contract with those Texas labs that were in existence at the time. Ahmed installed Individual B as the biller for these labs. As described below in more detail, of these four labs, Lab A was the only lab that performed any COVID testing during the charged scheme but, like OCL, Lab A performed far fewer tests than the claims Lab A submitted to HRSA for reimbursement. Summer Diagnostics, Softland, and Apollo performed no COVID testing whatsoever.

During this timeframe, Individual A continued to receive patient identifiers from Khan or Chaudhry that they received through individual collectors or online distribution of test kits. Ahmed, Khan and Chaudhry also ran four physical testing sites in Texas, which utilized QR codes to collect patient identifiers. These QR codes

---

[6] Of these five labs, four of them (Lab A, Summer, Softland and Apollo) received reimbursements. Artemis submitted claims but was not reimbursed. Ahmed and Chaudhry also formed an entity and opened a bank account for Helios Labs, but Helios did not ultimately submit claims to HRSA.

were uploaded automatically to an internet-based spreadsheet. Individual A and others had access to this spreadsheet. Individual A re-formatted patient data for Lab A's software and transmitted the re-formatted patient data to Individual B for billing. Individual B also received spreadsheets of patient identifiers, and instructions on how to bill them, from Lab A employees, Ahmed, and Khan.

### Summer Diagnostics

In October 2021, the month after HRSA ceased reimbursements to OCL, Ahmed purchased Summer Diagnostics from Individual I for approximately $400,000. Although Individual I understood that Ahmed was buying the lab, Khan's name was on the transaction agreement. At the time, Summer Diagnostics was managed by Individual J. Ahmed asked Individual J to stay on as lab manager. When Ahmed purchased Summer Diagnostics, it primarily ran urinalysis and blood chemistry tests. It did not perform COVID testing and had no COVID testing machines. Ahmed, Khan, and Chaudhry worked with Individual J to purchase new COVID testing machines, and to secure the certificates necessary to enable the lab to perform COVID tests. Because Khan advised the lab would process a low volume of COVID tests, Individual J procured only one machine that could process two PCR samples every approximately 45 minutes.

Summer Diagnostics began submitting claims to HRSA on November 10, 2021. Two months later, in January 2022, Khan authorized Individual J to post an advertisement for jobs for swabbers on behalf of Summer Diagnostics. Between November 10, 2021 and March 22, 2022, Summer Diagnostics billed HRSA for testing

that it claimed had taken place between March 2, 2021—while Ahmed was still working for Hospital A, long before he had purchased Summer Diagnostics—and December 2021. In total, Summer Diagnostics claimed to have performed 382,027 PCR tests. The false nature of these claims is also evidenced by the fact that, on March 31, 2022, ten days after Summer Diagnostics transmitted its last claim for reimbursement to HRSA, Individual J emailed Ahmed, Individual F, and Khan, saying that Summer Diagnostics had received COVID testing machines and was ready to begin running COVID tests as of that day. Summer Diagnostics, then, did not even have the equipment needed to run the tests during the period of the HRSA claims.

In response to a subpoena, Summer Diagnostics produced no laboratory data or other documents showing that the lab had performed any COVID testing. Summer Diagnostics received over $47 million in reimbursements from HRSA, based on the claims submitted before the lab was even operational.

**<u>Lab A</u>**

Prior to 2021, Individual D owned and ran LabB. At that time, Lab A ran mainly toxicology tests. It did not process COVID tests or have the equipment to do so. In November and December 2021, Siraj made a number of investments in LabB, including the purchase of COVID testing machines. In the same time period, Siraj was added as a signor to LabB's bank account, and Individual F was listed as the lab's registered agent with the Texas Secretary of State. In February 2022, Siraj was removed as signor on the bank account, and Khan was added.

Between March 2, 2022 and March 25, 2022, after Ahmed and his associates, including Khan, got involved, Lab A billed HRSA for a total of approximately 82,000 COVID tests performed on specimens purportedly collected between November 17, 2021 and March 15, 2022. Lab A produced data from their laboratory machines indicating that only approximately 31,000 COVID tests had actually been performed. In contrast, the Houston Department of Health records showed that Lab Areported approximately 9,000 COVID tests. Lab A received over $13 million in reimbursements from HRSA. After crediting for testing reflected by Lab A's data, at least $8 million of that amount was for tests that were never performed and for which no records exist.

**Softland and Apollo**

In late 2021 and early 2022, Ahmed, Khan and Chaudhry also took steps to set up two COVID testing labs at an office complex on Tanglewood in Houston. Ahmed paid Individual J to consult on opening these labs, including on what type of equipment, supplies, and employees they would need to perform COVID testing, and how to obtain the proper certifications. These certifications included Clinical Laboratory Improvement Amendments ("CLIA") Certificates, which authorize the lab to conduct complex testing based on the lab's equipment and compliance with certain standards. On November 22, 2021, CLIAs were issued listing Khan and Chaudhry as the owner and director of Apollo and Softland labs, respectively. Throughout the following four months, Khan, Chaudhry, Ahmed, Individual F and Individual J

worked to purchase testing machines, refrigeration equipment and reagents for COVID testing, as well as to market and hire employees.

But, despite the fact that these labs were not yet operational, Softland submitted claims to HRSA for tests Softland claimed took place between December 14, 2021 and February 23, 2022. On March 15, 2022, HRSA announced that it would stop accepting claims on March 22, 2022. Eight days later, on March 23, 2022, one day after the announced deadline, Apollo submitted claims to HRSA requesting reimbursement for tests run on samples purportedly collected between January 3, 2022 and February 20, 2022. The false nature of these claims is demonstrated by the fact that, a week after Apollo submitted claims for HRSA reimbursement, Individual J emailed Ahmed, Individual F, and Khan to say that Apollo and Softland would be ready to start COVID testing the following week. Once again, Softland and Apollo did not even have the equipment needed to run the tests for which these labs sought HRSA reimbursement.

In response to a subpoena, Apollo and Softland produced no laboratory data or other documents showing that the labs had performed any COVID testing. Apollo and Softland received over $7 million and $6 million in reimbursements from HRSA, respectively, based on the claims submitted before the labs were even operational.

### Money Laundering Activity

After HRSA's reimbursement program ceased and HRSA stopped accepting claims in March 2022, Ahmed, Khan and Chaudhry worked together to launder the funds received by Summer Diagnostics, Softland and Apollo.

**Summer Diagnostics**

Summer Diagnostics received HRSA funds in two different bank accounts, at two different banks, both in the name of Summer Diagnostics (the "Summer Accounts").

The Summer Diagnostics account ending in 9217 at Bank A was opened on March 27, 2015 by Individual I. Khan was added as a signatory to this account on October 22, 2021. The Summer Diagnostics account ending in 7917 at Bank C was opened on December 1, 2021, and Khan, Chaudhry and Ahmed were signatories. On November 4, 2021, just days before Summer Diagnostics started billing HRSA, Ahmed opened a bank account ending in 2032 at Bank C, in the name of SDLMM Management LLC, on which he was the sole signor (the "SDLMM Account").

In order to conceal the source of the funds in the Summer Accounts, Ahmed, Khan, and Chaudhry caused the funds to be transferred to an intermediate account, in a different name, before the funds were spent. Between December 2, 2021 and March 15, 2022, the Summer Accounts received over $62 million in HRSA funds. Almost immediately after the funds were received in the Summer Accounts, they were moved out to the SDLMM Account in successive transactions. Between December 6, 2021 and February 18, 2022, Ahmed and Khan transferred over $39 million of the HRSA funds from the Summer Accounts into the SDLMM Account. From there, Ahmed used the HRSA proceeds to fund accounts belonging to Ahmed

personally and to his businesses, and to fund purchases of, among other items, a $4.5 million dollar home, a Lamborghini, and two Teslas.

### Softland and Apollo

Less than a month after Softland Labs started billing HRSA, on March 23, 2022, Chaudhry opened a Bank A Account ending in 6385 in the name of Softland Labs LLC. The Softland account was funded by a $2,000 deposit from an account controlled by Ahmed and Individual F. On April 7, 2022, Chaudhry deposited $751.85 cash. There was no other activity in the account until May 2022, when the HRSA funds were deposited. Between May 3 and 6, 2022, the Softland account received four separate deposits from HRSA for COVID 19 reimbursements totaling $6,355,418.14. There were no other deposits or withdrawals in the account until January 23, 2023, when Chaudhry spent the proceeds of the fraud scheme by transferring them— namely, $6.3 million—to Ahmed's personal account at ETrade. On October 10, 2023, to close the account, Chaudhry purchased a cashier's check payable to the same account that initially funded the Softland account in the amount of $58,154.99.

A day after Chaudhry opened the Softland bank account, on March 24, 2022, Khan opened a Bank A account ending in 8127 in the name of Apollo Labs LLC. Khan opened the account with a $2,000 cash deposit. There were no other deposits or withdrawals in the account until May 2022, when the HRSA funds were deposited. Between May 5 and 9, 2022, the Apollo account received three separate deposits from HRSA totaling $7,134,961.26. Again, there were no other deposits or withdrawals in the account until January 23, 2023, when Khan spent the proceeds of the fraud

scheme by transferring almost the full amount, $7.1 million, to Ahmed's personal ETrade account. On April 28, 2023, to close the account, Khan purchased a cashier's check payable to Ahmed in the amount of $37,682.96.

As set forth below, the evidence that proves the existence of these conspiracies is very strong. Specifically, the government's evidence at trial will include, among other things:

(1) the testimony of Cooperator A, a cooperating defendant, who provided Ahmed with a list of patient information from Hospital A, which they used to create fraudulent claims for reimbursement;

(2) testimony from individuals who collected patient data;

(3) testimony from medical billers, I.T. professionals, and others who were directed by Ahmed, Khan, Siraj and others to bill HRSA for COVID tests;

(4) testimony from owners and employees of the labs through which these fraudulent claims were billed;

(5) the claims for reimbursement, and testimony from one or more data analysts regarding the use of the patient information provided by Cooperator A, as well as redundant, jumbled and fictitious data, in the claims;

(6) data from OCL and Lab A showing the actual number of COVID tests performed; and

Below, the government summarizes some of the evidence that it will present regarding the existence of the charged conspiracies. Such evidence establishes the threshold requirement for admitting coconspirator statements during the trial in this case.

**A.      Cooperating Defendants and Witness Testimony**

**i.        Testimony of Cooperator A**

At trial, the government expects that Cooperator A, a cooperating defendant, will testify that he worked at Hospital A with Anosh Ahmed and that, after Ahmed resigned in March 2021, Ahmed asked Cooperator A to send him a list of Hospital A's patients. Cooperator A will testify that he sent the Hospital A patient list to Ahmed using his personal email account.

### ii.    Testimony From Collectors and Marketers

In addition to the patient data provided by Cooperator A, Ahmed, Khan and Chaudhry collected patient information in a variety of ways. For example, Individual A will testify that Khan submitted names from people who ordered at-home test kits from Khan's Shopify website. The government also expects the evidence to show that, in 2021, Khan and Chaudhry engaged a marketing firm run by Individual M to distribute marketing materials and collect patient identifiers from individuals who received, or were interested in receiving, at-home test kits.

The government also expects that Individual H will testify that, in 2021, when he (Individual H) was living in Florida, Ahmed sent home test kits to Individual H in Florida and paid Individual H to distribute the test kits at events and to collect patient identifiers from people who received the test kits. Individual H will also testify that Ahmed never instructed Individual H on how to return the specimens to a lab, and that Individual H instead destroyed the specimens. Individual H will testify that, at Ahmed's direction, he transmitted spreadsheets containing the patient information he collected to Individual A for the purpose of billing it through the labs run by Ahmed, and that Ahmed paid him on the basis of how many patient identifiers he collected. Individual H will also testify that, in 2022, Ahmed paid him to run a

23

testing site in Houston located at a closed Dave and Buster's restaurant; that Ahmed and Chaudhry set up the testing location and that they participated in frequent, regular meetings and calls about how the sites were running and how many tests were being collected.

### iii. Lab Employees

The government expects that Individual I, former owner of Summer Diagnostics, will testify that Summer did not perform COVID testing and was not equipped to do so at the time Ahmed purchased it. Individual I will also testify that, although Ahmed was purchasing the lab, Ahmed wanted Khan's name on the paper, and that he accompanied Khan to the bank to add Khan's name as a signatory to Summer Diagnostic's bank account. The government expects Individual I will also testify that Khan and Individual B called him to obtain the login information for the internet portal through which Summer submitted claims to HRSA, and Individual I gave it to them.

Individual J, the lab manager at Summer Diagnostics, will testify that Ahmed wanted Summer Diagnostics to start performing COVID testing, and that he advised them on the purchase of COVID testing machines and refrigeration equipment, and the number of employees necessary, to begin COVID testing. Individual J will also testify that Ahmed paid him to consult in the same capacity on Softland and Apollo labs. Individual J will testify that Khan was his main point of contact for these communications. The government also expects to introduce numerous emails between Individual J and Ahmed, Khan and Chaudhry discussing their plans and

24

progress toward performing COVID testing at these labs. Individual J will testify that he visited Softland and Apollo in late 2021 and early 2022, and observed that there was no equipment at the lab. Consistent with his email communications to this effect, none of these three labs did any COVID testing, and, in August 2023, Individual J counseled Khan to not seek to renew a certification where renewal would have required an inspection that would have revealed the labs contained no COVID testing machines.

The government expects that Individual D, former owner of Lab A, will testify that Lab A did not do COVID testing and was not equipped to do COVID testing, when Siraj approached him about buying the lab in the end of 2021. Individual D will testify that Siraj purchased COVID testing machines for LabB, and that Siraj and Ahmed both talked about buying the lab from him at different points, although the purchase was never completed or memorialized. Individual D will testify that Lab A started doing COVID testing on patient specimens received from Siraj and Ahmed, as well as other unrelated collectors. However, Individual D became suspicious when he saw $13 million of HRSA funds were deposited. Individual D confronted Siraj and Ahmed, and transferred the funds to a bank account that he (Individual D) controlled solely, preventing Siraj and Ahmed from having access to the funds.

The government also expects to call employees of Lab A, including Individual K, the Lab Administrator for Lab A. The government expects Individual K will testify that Khan was Ahmed's Director of Operations and gave operational directions to Lab A's staff. Individual K will testify that Khan and Chaudhry both visited Lab A

and that she communicated more with Khan and Chaudhry than with Ahmed. Through Individual K or Individual A, the government will introduce a WhatsApp chat with Ahmed, Khan, Siraj, Individual A and others, which discussed ongoing operational issues such as the number of patient samples being processed and when and how results were being provided. Individual K will testify that she saw Khan delete messages from their WhatsApp chats.

### iv. Billers and IT Professionals

The government expects that Individual O will testify that he was part owner of OCL, and that he designed the software system the lab used (the "OCL Lab Information System" or "LIS"). Individual O will explain how the LIS worked and how it was supposed to interface with the testing. Individual O will testify that Siraj instructed him to handle Ahmed's samples differently from others, including by excluding Ahmed's samples from the billing file and from the interface that reported results to IDPH. The government expects to introduce emails and text messages demonstrating these communications. The government also expects Individual O will explain that test results were reported to patients at the email address provided for the patient. The email contained a link to view the results that was protected by a password, which involved the patient's date of birth, but the email did not contain any information identifying the patient. Individual O will testify that all of Ahmed's samples were sent to a single email address with a Hospital A domain, meaning that there was no way to identify which patient the results belonged to or, therefore, to

26

access the results with the patient's date of birth, and thus, to have access to any information by which to send test results to the patient if such test results existed.

The government expects Individual A will testify that he was employed by Ahmed to receive and re-format patient data so that it would be compatible with the biller's needs at each lab. Individual A will testify that he received patient identifiers via text, email, and Google spreadsheets, and that the data came from a number of collectors, including Individual H, and from a number of states including Texas, Florida, Illinois, California, Alabama, Louisiana and Missouri. Individual A re-formatted the data specifically for each biller or lab that he worked with – first for OCL, then for LabB, and then for Individual B. Through Individual A, the government expects to introduce numerous email and text message conversations involving Khan and Chaudhry in which testing and billing issues are discussed.

Individual C, the biller for OCL, will explain how OCL billed insurance and HRSA for COVID testing. The government expects Individual C will testify to how Ahmed's samples were treated differently. Namely that, in approximately June 2021, around the same time that Siraj directed Individual O not to report Ahmed's test results to IDPH and to exclude them from the billing file, Siraj directed Individual C to bill directly from the spreadsheets of patient information that Individual A uploaded rather than from the billing file produced by the Lab Aased on test results.

Individual B, the biller for LabB, Summer, Softland and Apollo, will explain how she billed HRSA for COVID testing. The government expects Individual B will testify that she received patient data from Individual A, Ahmed, and Khan, and that

27

she communicated with them about when patient data was coming in and what had been billed. Individual B will also testify that after the HRSA program stopped and her billing work was completed, Ahmed instructed her to delete the emails and spreadsheets containing patient billing information, and she instructed her staff to do that.

### v. Claims Data

The government will introduce at trial the claims for reimbursement that HRSA received from all five labs. The claims data contains patient demographic information, such as name, date of birth, and address; as well as the date of service, on which the patient sample was purportedly collected. The government expects to call one or more data analysts to testify regarding the claims data submitted to HRSA and the various patient rosters that were submitted to billers during the course of the scheme. The government expects an analyst to testify that names of Hospital A patients, from Loretto's internal database, sent to Ahmed by Cooperator A and Individual F, were billed to HRSA through OCL. The government also expects the analyst to testify to facts supporting a conclusion for the jury to draw that the co-defendants manipulated the patient data they received to inflate the number of claims and thus increase the amount of HRSA reimbursements. For example, the government expects the analyst to testify that claims data submitted from OCL, LabB, Softland and Apollo included duplicates, meaning these entities billed HRSA for the same test on the same patient (with the same date of service) more than once. The government also expects the analyst's testimony will show that the submitted

claims data included scrambled information, meaning patient names were submitted more than once with different addresses, different dates of birth, and different genders.

## IV.   Coconspirator Statements

Based on the foregoing proffer of evidence demonstrating the existence of the scheme to defraud, involving Khan, and the money laundering conspiracy involving Khan and Chaudhry, the government intends to offer certain coconspirator statements at trial pursuant to FRE 801(d)(2)(E). The statements between the coconspirators in furtherance of the conspiracies fall into several categories, all concerning subjects integral to the success of the charged conduct. These statements—which will establish the coconspirators' planning and preparation of the crimes, the information flow between coconspirators, and the coconspirators' attempted concealment of the crimes—will be introduced through the testimony of a cooperating defendant and witnesses, including but not limited to those noted above.

The government does not detail each and every proposed coconspirator statement of each witness here. Nor does *Santiago* or the Seventh Circuit's precedent require the government to set forth every specific, verbatim coconspirator statement. Instead, the Seventh Circuit has specifically stated that categories of statements suffices. *See United States v. McClellan*, 165 F.3d 535, 554 (7th Cir. 1999) (rejecting the argument that the "government is bound to give notice in advance of trial of co-conspirator statements it intends to introduce at trial"); *United States v. Johnson*, No. 08 CR 466, 2011 WL 809194, at *8 (N.D. Ill. Mar. 2, 2011) (rejecting defendant's argument that the government failed to "specifically identif[y] the statements it

29

intends to introduce" and rejecting defendant's request "that the Government be required to specifically identify each statement by a co-conspirator it intends to introduce"). To that end, the coconspirator statements offered at trial will concern the subjects listed below, and include, but are not limited to, the coconspirator statements discussed above:

1. Statements regarding other coconspirators, including the following:

   a. Identifying other members of the conspiracies and their roles in carrying out the crimes;

   b. Reviewing a coconspirator's exploits and criminal acts committed in order to, among other things, update a fellow coconspirator on actions taken by the group;

   c. Reporting coconspirators' status and in turn receiving assurances of assistance from coconspirators;

2. Statements to conduct or help conduct the conspiracies' activities, including the following:

   a. The purpose behind criminal acts carried out by the conspiracy;

   b. To plan criminal acts by the conspiracies;

   c. To instill and maintain the trust and cohesiveness of the conspiracies;

   d. To advise of the progress and accomplishments of the conspiracies;

   e. To inform or reassure a coconspirator regarding the conspiracies' activities;

   f. To control damage to an ongoing conspiracy;

   g. Statements to outsiders to enhance the conspiracies' position in the eyes of outsiders and express confidence about the ability of the conspiracies; and

h. To inform and update others about the current status of the conspiracies or a conspiracy's progress (including failures);

3. Statements concerning the means used to conceal the conspiracies' illegal activities; and

4. Statements to others outside the conspiracies to seek their cooperation and to encourage them to not reveal incriminating information.

As set forth above, the co-conspirator statements in this case include communications of the defendants with each other and the communications of the defendants with the people on the list below:

1. Individual O and Individual C regarding billing and reporting of Ahmed's samples at OCL;

2. Individual B regarding billing at the Texas labs;

3. "Individual A" regarding Individual A's receipt and submission to OCL of patient data;

4. Individual I, Individual J, and Individual D regarding Ahmed's purchase of the Texas labs and use of Khan and Chaudhry's names on the paperwork;

5. Lab managers and employees such as Individual D, Individual J and Individual K, regarding lab testing and operations (or the lack thereof) at the Texas labs;

6. Collectors, marketers and collection site employees regarding the operation of testing sites and other sources of patient information ultimately submitted to HRSA for reimbursement.

## V.  Conclusion

Based on the above proffer of evidence, the government has made a sufficient preliminary showing by a preponderance of the evidence, as contemplated by *Santiago* and its progeny, of the existence of and participants in two conspiracies, so that the Court can rule on the admissibility of statements made in furtherance of the conspiracy under FRE 801(d)(2)(E), to the extent any are offered as such at trial.

ANDREW S. BOUTROS
United States Attorney

By:  *s/Kelly Guzman*
KELLY GUZMAN
DIANE MACARTHUR
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
312-353-5300