IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    25 CR 321-1 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| ANOSH AHMED | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT ANOSH AHMED'S MOTION TO JOIN DEFENDANT KHAN'S MOTION TO DISMISS WITH PREJUDICE OR IN THE ALTERNATIVE FOR AN EVIDENTIARY HEARING BASED UPON PROSECUTORIAL MISCONDUCT IN THE GRAND JURY**

Defendant Anosh Ahmed moved to join defendant Mahmood Sami Khan's then-pending Motion to Dismiss With Prejudice or in the Alternative for an Evidentiary Hearing Based Upon Prosecutorial Misconduct in the Grand Jury. ("Motion to Join"). R. 110. In his motion, Ahmed asked the Court to dismiss the indictment against him with prejudice and to order the government to produce grand jury transcripts to him. *Id.* Khan's motion is no longer pending. The question whether Ahmed—who has not been arraigned because he is a fugitive—can participate in these proceedings is the principal issue to be decided at this time.[1] Relying on applicable authority, the government respectfully requests that the Court deny without prejudice the instant motion and any future motion he may file, until such time as Ahmed subjects himself to the jurisdiction of this Court.

---

[1] On June 12, 2026, on the motion of the government, the Court dismissed with prejudice the charges against Khan and co-defendant Suhaib Ahmad Chaudhry. R. 121. The government is in the process now of re-presenting the evidence as to Ahmed and his co-defendant to a different grand jury.

1

## I.     BACKGROUND

Loretto Hospital is a safety net medical facility serving the west side of Chicago. R. 1 at 7. Loretto hired Ahmed in November 2017, while Ahmed was still in his medical residency. *Id.* Ahmed received his medical license in December 2017. *Id.* Ahmed thereafter served as Loretto's Chief Operating Officer (COO) and as Loretto's Chief Financial Officer (CFO). *Id.* Ahmed left Loretto in March 2021. *Id.*

The charges in this case focus on Ahmed's submission of false claims for reimbursement for COVID testing after he left Loretto. COVID began to spread throughout the world beginning in December 2019. R. 1 at 1. Various tests were developed to detect whether an individual had contracted the COVID virus. *Id.* Some of these tests required laboratories to determine the test results. *Id.* Between March 2020 and March 2021, multiple federal laws were enacted to provide funding for the reimbursement to hospitals and other health care providers, including laboratories, for COVID testing for uninsured individuals. *Id.* at 2. The Health Resources and Services Administration (HRSA), an agency of the United States Department of Health and Human Services, oversaw and administered the reimbursement of claims submitted by health care providers for COVID testing. *Id.*

Ahmed was associated with a laboratory in Chicago, and he controlled various clinical laboratories in Texas. R. 1 at 8. Five of the Texas laboratories, however, were non-operational, that is, not capable of conducting COVID testing. *Id.* On June 12, 2025, a grand jury returned the indictment in the instant case naming Ahmed and others as defendants. R. 1 (the "Loretto 2" case). The indictment alleges that, between

2

April 2021 and June 2022, Ahmed, among others, caused these five laboratories, and other laboratories, to prepare and submit false claims to HRSA seeking reimbursement for COVID testing. *Id.* at 11. The false claims sought reimbursement in the amount of approximately $894,520,064 and resulted in actual payments in the amount of approximately $293,221,468. *Id.* An arrest warrant was issued in the instant case for Ahmed's arrest. R. 4. Ahmed has not subjected himself to the jurisdiction of this Court; the warrant is still outstanding.

Ahmed is also charged in a separate case that focuses on conduct by Ahmed and others while Ahmed was employed at Loretto. The indictment in this other case was returned about one year earlier, on July 11, 2024. *See United States v. Anosh Ahmed, et al.,* No. 24 CR 232 (Gettleman, J.). R. 26 (the "Loretto 1" case). Ahmed is charged in Loretto 1 with wire fraud, aiding and abetting embezzlement, and money laundering. *Id.* An arrest warrant was issued for Ahmed's arrest in the Loretto 1 case. R. 30. Ahmed has not subjected himself to the jurisdiction of this Court in the Loretto 1 case either; this other warrant for his arrest is still outstanding.

Ahmed was aware that the government was investigating COVID testing claims in 2022, two years before the issuance of the Loretto 1 indictment in July 2024. On June 28, 2022, for example, the FBI served a grand jury subpoena on Ahmed's company, Anosh, Inc., requesting "all documents related to COVID testing" and documentation of payments received for COVID testing.

On or about August 23, 2023, Ahmed left Chicago and traveled to France and to Dubai. On November 30, 2025, Ahmed was arrested in Belgrade, Serbia based on

3

the warrants and international notices issued in the Loretto cases. Ahmed is now in custody in Serbia based on ongoing extradition proceedings and is opposing his return to the United States.

## II. THIS COURT SHOULD EXERCISE ITS DISCRETION UNDER THE FUGITIVE DISENTITLEMENT DOCTRINE TO PREVENT AHMED FROM RECEIVING THE BENEFIT OF LITIGATING CHALLENGES TO THE CHARGES WHILE AVOIDING THE RISK OF CONVICTION.

Ahmed is a United States citizen who has thus far refused to subject himself to the jurisdiction of this Court by returning to the United States to face the charges against him. Yet, at the same time, Ahmed wishes to secure for himself the same status in this proceeding as a defendant who has been arraigned and is eligible for the benefits—and subject to the risks—of the criminal process. Respectfully, as a matter of law and equity, this Court should deny Ahmed's requests to "have his cake and eat it too," and apply the fugitive disentitlement doctrine and decline to consider any challenge to the pending charges or any requests for discovery, including grand jury transcripts, unless and until he returns to the United States and is arraigned in person before this Court.

The fugitive disentitlement doctrine vests a court with discretion to refrain from considering a motion or application by a fugitive defendant. *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970). *See also Degen v. United States,* 517 U.S. 820, 823-24 (1996) ("Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities."). The doctrine "generally permits a federal court to insist on a defendant's presence in the jurisdiction before it resolves

challenges to the criminal charges." *United States v. Martirossian*, 917 F.3d 883, 885 (6th Cir. 2019).

The fugitive disentitlement doctrine began as a "judicial doctrine allowing appellate courts to dismiss appeals from criminal fugitives who failed to surrender to authorities, holding that such failure 'disentitles the defendant to call upon the resources of the Court for determination of his claims.'" *United States v. Batato*, 833 F.3d 413, 426 (4th Cir. 2016) (quoting *Molinaro*, 396 U.S. at 365-66). The doctrine "stands for the proposition that those who flee from judicial process may not benefit from it." *United States v. Bokhari*, 757 F.3d 664, 674 n. 7 (7th Cir. 2014). This doctrine accounts for "the difficulty of enforcement against one not willing to subject himself to the court's authority, the inequity of allowing [a] 'fugitive' to use the resources of the courts only if the outcome is an aid to him," and "the need to avoid prejudice to the nonfugitive party[,]" here, the United States and Ahmed's co-defendant. *United States v. Barnette*, 129 F.3d 1179, 1183 (11th Cir. 1997).

The term "fugitive" for purposes of the fugitive disentitlement doctrine has been applied both to a person who flees from the jurisdiction after appearing in a pending proceeding as well as to a person who "while abroad [learns] that they are under indictment and make[s] no effort to return to the United States to face charges." *United States v. Bokari*, 757 F.3d 664, 672 (7th Cir. 2014). The term can also apply to someone who has never even set foot in the United States but is aware of the charges against them and therefore is a "functional" fugitive. *In re Kashamu*, 769 F.3d 490, 493 (7th Cir. 2014); *see also United States v. Kashamu*, 656 F.Supp.2d

5

863 (N.D. Ill. 2009) ("Since [defendant] has retained a Chicago law firm to represent him . . . [and] he may be somewhere in Nigeria, the Court can safely infer that [defendant] is aware of the charges against him, and 'is purposefully absenting himself from the United States to avoid arrest and arraignment on the charges.' The Court therefore considers [defendant] a fugitive."), *quoting United States v. Oliveri,* 190 F. Supp. 2d 933, 936 (S.D. Tex. 2001).

The government respectfully requests that the Court exercise its discretion to apply the fugitive disentitlement doctrine and refrain from considering any motions or requests by Ahmed at this time. Application of the doctrine will prevent Ahmed from securing any benefits of the Court's resources without having to appear to face the pending charges, and, at the same time, will not foreclose Ahmed from pursuing the same relief, if available, at such time as he chooses to appear before this Court to be arraigned, thereby subjecting himself to the Court's authority.

### A.    Ahmed is a Fugitive.

Ahmed is a fugitive for purposes of the fugitive disentitlement doctrine— whether or not Ahmed left the United States before he knew of the charges against him. The fugitive disentitlement doctrine applies whether the flight is actual (that is, to avoid charges of which the person is aware) or constructive. A constructive-flight fugitive is a person "'[(1)] who allegedly committed crimes while in the United States but [(2)] who was outside the country—for whatever reason—when she learned that her arrest was sought and [(3)] who then refused to return to the United States in order to avoid prosecution.'" *United States v. Bardakova,* 145 F.4th 231, 242 (2d Cir.

6

2025), *quoting United States v. Bescond,* 24 F.4th 767, 772 (2d Cir. 2021). *See In re Kashamu*, 769 F.3d at 493 (explaining that a defendant who "didn't literally flee the United States, since he was never in the United States," was "functionally a fugitive").

Ahmed asserts in his Motion to Join that he traveled from the United States for "business and other reasons" before any indictment was returned against him and that "[h]is return to the United States was delayed because of several significant family health issues." R. 110 at 4 n.1. But, even if Ahmed had no knowledge of impending charges (a point belied by the pre-indictment communications his attorneys had with the government), and even if there existed other reasons for not returning to the United States, the fugitive disentitlement doctrine properly would be applied here.

This is all the more so, because at any moment, Ahmed has the power to return to the United States; he is free to waive extradition and subject himself to this Court's authority, but has elected not to do so. "A person may be considered a constructive-flight fugitive if they have multiple reasons for remaining abroad, so long as one reason is to avoid prosecution in the United States." *Bardakova,* 145 F.4th at 242-45. Here, there can be little doubt that avoiding prosecution is one of those reasons. Indeed, all indicators suggest it is Ahmed's main reason. Ahmed has chosen to remain in a Serbian prison and fight extradition, rather than subject himself to the United States criminal justice system. Ahmed should not be permitted to enjoy the benefits of the American criminal system as he fights and resists this country's judicial process.

7

The reality here is that, when Ahmed left the country in August 2023, he was aware that he or one of his business entities were a subject of a federal investigation involving COVID billing. In December 2023, four months after Ahmed left the country, the government seized approximately $10 million from one of Ahmed's investment accounts and, the following month, one of Ahmed's Chicago-based attorneys reached out to one of the prosecutors for information about the case. And, after June 2025, Ahmed knew he had been charged in this case. Since approximately February 2024, Ahmed's attorneys have had robust conversations with prosecutors about the merits of the charges and the prospect of Ahmed's voluntary return to the United States.[2] At the very latest, Ahmed became aware of the charges against him in both Loretto 1 and Loretto 2 when he was arrested in Serbia on the United States-based arrest warrants. Indeed, Ahmed's intent to flee, for purposes of the fugitive disentitlement doctrine, can be inferred from his failure to surrender to authorities once he learned that charges against him were pending. *See United States v. Catino,* 735 F.2d 718, 722 (2d Cir. 1984).

**B.    This Case Implicates the Core Purposes of the Fugitive Disentitlement Doctrine.**

"The Supreme Court has recognized a number of different rationales justifying the use of the [fugitive disentitlement] doctrine." *Bagwell v. Dretke*, 376 F.3d 408, 411 (5th Cir. 2004). These rationales include "(1) a party's fugitive status [that] can render

---

[2] In an email dated July 3, 2024, for example, three months before Ahmed's indictment in Loretto 1, Ahmed's attorneys requested from prosecutors in this case additional information about what charges might be brought against Ahmed. Ahmed's attorneys also discussed in the email Ahmed's forthcoming response to a subpoena relating to business entities associated with Ahmed.

a judgment 'impossible to enforce'; (2) the inequality of allowing a fugitive to 'call upon the resources of the Court for determination of his claims,' and (3) the need to 'discourage[] the felony of escape and encourage[] voluntary surrenders." *Jaffee*, 294 F.3d at 596, *quoting Degen,* 517 U.S. at 824. *See also United States v. Lopez Bello*, 2023 WL 3199968 (S.D.N.Y. May 2, 2023), *citing Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 280-82 (2d Cir. 1997).

Application of the fugitive disentitlement doctrine to Ahmed is consistent with the doctrine's core purposes. Ahmed "is attempting to obtain the benefit of a favorable ruling from this court without risking the burdens that may flow from an adverse ruling." *Oliveri*, 190 F. Supp. 2d at 936. If this Court were to address the merits of a motion to dismiss from Ahmed, or conduct an evidentiary hearing at his request, and rule against him, "such a ruling [could] have no effect" on Ahmed as the Court would be unable to require Ahmed to move forward to trial. The public's interest in judicial efficiency and the integrity of this Court's orders is served by avoiding the issuance of any orders that Ahmed may choose to ignore from abroad.

Indeed, consideration of any challenge to the charges against Ahmed is particularly problematic, as it would allow Ahmed to participate on par with a co-defendant who has appeared as required, while avoiding any potential consequences of subjecting himself to the Court's jurisdiction—up to and including serving any sentence the Court might impose following conviction. Permitting Ahmed to seek the benefit of the court's resources without facing the attendant risks would eliminate any incentive for him to appear, and would undermine this Court's authority and the

force and effect of its orders. Moreover, it would have the effect of discouraging voluntary surrender and encourage others to resist the Court's valid exercise of jurisdiction.

"Federal courts do not play 'catch me if you can.' If a defendant refuses to show up to answer an indictment, ignores an arrest warrant, or leaves the jurisdiction, the court may decline to resolve any objections to the indictment in his absence." *Martirossian*, 917 F.3d at 885. Otherwise, this Court essentially would be consigned to writing "what amount[s] to [an] advisory opinion[] that [is] unlikely to be enforced if the court rules against the fugitive." *Id.* at 890. The fact that Ahmed's Chicago-based attorneys have little direct communication with him while he is in Serbian custody adds another complication in that it creates the risk of future duplicative or inconsistent litigation and allows the defendant to complain later that he was not present during a critical stage of his criminal prosecution or that his attorneys provided less than effective representation, as that term is understood in post-conviction litigation.

### C.     Allowing Ahmed to Proceed With a Motion to Dismiss Will Prejudice the Other Parties to This Proceeding.

Ahmed will not be unduly prejudiced by this Court applying the fugitive disentitlement doctrine at this time to prevent his substantive participation in this case. Ahmed is still entitled to file a motion to dismiss the indictment pending against him with prejudice pursuant to Fed.R.Crim.P. 12(b)(3)(v) after he is arraigned, and prior to a trial based on claimed errors in the grand jury proceeding or any other issues he seeks to raise. In contrast, there is potential prejudice to Ahmed's co-

defendant should Ahmed be allowed to participate from afar. While Ahmed's co-defendant, who has appeared, and who is subject to conditions of release, including the surrender of his passport, will be required to move forward with the prosecution should the Court deny any motion to dismiss the co-defendant files on his own behalf, Ahmed will have the privilege of remaining beyond the Court's reach, potentially causing delays in the proceedings or other prejudice. This Court should not accept such an unfair and imbalanced result.

There is yet another reason to disallow the unfair relief that Ahmed seeks: the consideration by the Court of substantive motions by Ahmed also prejudices the government and the public. The government faces through a motion to dismiss from Ahmed the potential risk of dismissal of the indictment with prejudice, without being given the opportunity to correct any taint in the original grand jury proceeding by re-presenting the evidence to a new grand jury. Ahmed is charged with being the leader of a nine-figure fraud scheme that resulted in the loss of hundreds of millions of dollars earmarked for COVID testing of uninsured individuals. The public and taxpayers have a legitimate interest in seeing Ahmed subject himself to the Court for prosecution, and anything that reduces his incentive to appear is against the public's interest in justice and fair play.

### D.     Ahmed is Not Entitled to Discovery or an Evidentiary Hearing.

Ahmed is not entitled to discovery at this stage of the proceeding given that he has not yet been arraigned and instead has avoided subjecting himself to this Court's authority. The discovery obligations imposed by the Federal Rules of Criminal

Procedure presume a defendant's participation in the proceedings before the Court. Ahmed will receive the discovery to which he is entitled once he subjects himself to the Court's jurisdiction. *See Weatherford v. Bursey,* 429 U.S. 545, 559 (1977). *See also United States v. Nabepanha,* 200 F.R.D. 480, 483 (S.D. Fla. 2001) (court applies fugitive disentitlement doctrine in finding defendant not entitled to discovery).

There are good reasons not to provide Ahmed with discovery before he appears. First, there is a protective order in place in this matter because the discovery materials contain sensitive information. The parties and the Court can only enforce a protective order against those defendants who are subject to the Court's jurisdiction. An additional reason for heightened concern is that Ahmed is in the custody of a foreign government, where the ability to protect discovery materials is unknown, and the risk of improper disclosure may be substantially increased.

Second, a defendant awaiting trial is also often subject to conditions of release designed to protect the sanctity of the criminal proceedings, including conditions prohibiting the defendant from having contact with individuals associated with the case, such as key witnesses. Such restrictions may be imposed only on persons subject to the Court's jurisdiction, and any such restrictions applied to Ahmed would be unenforceable unless and until Ahmed became subject to the Court's jurisdiction.

Third, the granting of a fugitive defendant's request for discovery, or an evidentiary hearing, would also set an untenable precedent. Other defendants on the fugitive docket would be encouraged to seek discovery, or a hearing, in order to challenge their case or to assess the strength of the evidence against them, all in an

effort to defeat the charges without needing to appear in Court and while such persons continue to evade prosecution.

More specifically, Ahmed should not be given the benefit of the type of evidentiary hearing that Khan requested as alternative relief in his Motion to Dismiss. Ahmed, unlike Khan, is not present for any such hearing, a critical stage of the proceeding, and is unable to assist his attorneys in its preparation or presentation. The hearing also would not produce the answers Khan identified because of deliberative process and pre-decisional privileges attached to many of the areas Khan wished to explore. *See* R. 100 at 31-34. Khan, for example, wanted "[a]ll written communications—emails, memoranda, internal review notes, and the like— within the U.S. Attorney's Office concerning AUSA A's conduct in the grand jury proceedings underlying the case. . . ." *Id.* at 32. These are core Article II internal communications. The Seventh Circuit has not permitted this type of inquiry into "[h]ow the United States reaches its litigating positions, [and] who said what to whom within the prosecutor's office" because of "multiple privileges" that cover intra-office conversations and memoranda. *See In re United States of America,* 398 F.3d 615, 618 (7th Cir. 2005). Ahmed should not be permitted to put the cart before the horse—a substantive hearing before he himself appears—particularly a hearing that seemingly collides with the parameters established by the Seventh Circuit.

**E.    Cases Declining to Apply the Fugitive Disentitlement Doctrine are Distinguishable from the Circumstances of this Case.**

Cases in which courts have declined to apply the fugitive disentitlement doctrine are distinguishable from the circumstances involved in this case. In *In re*

*Hijazi,* 589 F.3d 401, 407-08 (7th Cir. 2009), for example, the Seventh Circuit found that the fugitive disentitlement doctrine did not apply to a Kuwaiti national's motion to dismiss an indictment because the defendant "has never been in the country, he has never set foot in Illinois, and he owns no property in the United States." 589 F.3d at 412. But, in *Hijazi,* the defendant voluntarily surrendered to Kuwaiti authorities after learning of the indictment, Kuwait decided not to prosecute or to extradite Hijazi, and the defendant was not a United States citizen and had never resided in the United States. None of those factors are present here. Ahmed is a United States citizen who has spent considerable time in the United States, including during the period of time in which he is alleged to have participated in and coordinated the fraud schemes charged in Loretto 1 and Loretto 2. Moreover, Ahmed never voluntarily surrendered to authorities—here or in Serbia or even Dubai—and to the contrary, is in the process of fighting extradition from Serbia. In addition, *Hijazi* also predated the Seventh Circuit's consideration of the fugitive disentitlement doctrine in *Kashamu,* which itself recognized the "realities of modern criminal prosecutions." *See also United States v. Hayes*, 118 F.Supp.3d 620, 626 (S.D.N.Y 2015) (noting that "[t]he Court cannot be bound by the semantics that limit fugitive status to fleeing or failing to return when dealing with an international criminal defendant who allegedly violated United States law from abroad").

The three cases relied upon by Ahmed in his Motion to Join are also inapposite. R. 110 at 6 n.2. Ahmed cites *Degen v. United States,* 517 U.S. 820 (1996), for its statement that, "[t]he sanction of disentitlement is most severe." 517 U.S. at 828; R.

110 at 4 n.1. But once again the circumstances of *Degen* differ substantially from this case. In *Degen,* the defendant, a citizen of the United States and Switzerland, was charged in the United States with drug and money laundering offenses. 517 U.S. at 821-22. The United States also initiated a civil forfeiture proceeding against some of the defendant's United States-based properties. *Id.* at 821. The defendant was in Switzerland when the criminal charges and the civil forfeiture complaint against him were unsealed. *Id.* at 821-22. The extradition treaty did not oblige Switzerland to turn its national over to the United States and, as a result, there was no prospect that the defendant would be returned to the United States to face the criminal charges. *Id.* at 822. The defendant, while remaining outside the United States, filed an answer contesting the civil forfeiture. *Id.* The district court granted the government's motion to strike the defendant's claims in the civil forfeiture proceeding and entered summary judgment against the defendant. *Id.* The district court held that the defendant was not entitled to be heard in the civil forfeiture proceeding because he remained outside the country and unamenable to criminal prosecution. *Id.* The Ninth Circuit affirmed. *See United States v. Real Property Located at Incline Village,* 47 F.3d 1511 (1995).

The question before the Supreme Court in *Degen* was "whether the [fugitive disentitlement] doctrine should be extended to allow a court in a civil forfeiture suit to enter judgment against a claimant because he is a fugitive from, or otherwise is resisting, a related criminal prosecution." *Id.* at 822-23. The Court noted its earlier decisions upholding disentitlement involving fugitives. *See, e.g., id.* at 824, *citing*

*Molinaro v. New Jersey,* 396 U.S. 365, 366 (1970) (an appellant's escape "disentitles" him to "call upon the resources of the Court for determination of his claims"). The Court also acknowledged that disentitlement "promotes the efficient, dignified operation' of the courts." *Id.* at 824, *quoting Estelle v. Dorrough,* 420 U.S. 534, 537 (1975). But, in the circumstances of the *Degen* case, including that there was no risk of delay or frustration in determining the merits of the government's forfeiture claims since the district court's jurisdiction over the property at issue was secure, the Supreme Court found that there was no danger the district court would waste its time rendering a judgment unenforceable in practice. *Id.* at 825. The Court found that there were alternative means of protecting the government's interests—and vindicating the Court's powers—and that there was a lack of necessity for "the harsh sanction of absolute disentitlement." *Id.* at 827.

Here, in contrast, there has been no judgment entered, that is, no adverse action, taken by a court against Ahmed and he is not being foreclosed from litigating an ancillary action. Application of the fugitive disentitlement doctrine in this case would faithfully uphold the purposes of the doctrine, as recognized by the *Degen* Court. As such, *Degen* actually supports the government's position regarding disentitlement.

Second, in *United States v. Bokhari,* 757 F.3d 664, 672 (7th Cir. 2014), defendant was a dual citizen of the United States and Pakistan. 757 F.3d at 666. The defendant lived in Wisconsin for more than a decade. *Id.* The defendant moved to Pakistan in 2001 while the United States-based fraud scheme with which he was

later charged was still ongoing. *Id.* The defendant was charged in 2004 and submitted an extradition request to Pakistan. *Id.* In 2007, a Pakistani magistrate declined to authorize extradition. *Id.* In 2013, the defendant's United States attorneys filed with the district court a motion in which they argued that the Pakistani magistrate judge's finding raised international comity concerns and that the government had violated his speedy trial rights. *Id.* A magistrate judge recommended denying the motion on its merits. *Id.* The district court did not accept the magistrate judge's recommendation and denied the defendant's motion without prejudice pursuant to the fugitive disentitlement doctrine. *Id.* The district court held that the defendant was a fugitive and that his refusal to submit to the jurisdiction of the district court "'disentitles [him] to call upon the resources of the Court for determination of his claims.'" *Id.* at 672, *quoting Molinaro,* 396 U.S. at 366.

On appeal, the Seventh Circuit found that it had jurisdiction to review the defendant's claim that comity with Pakistani courts required dismissal of the indictment. *Id.* at 669. The court elected to "not opine on the fugitive disentitlement doctrine" because that issue was complicated by questions regarding "whether [the defendant] me[t] the legal definition of a fugitive." *Id.* at 672. Specifically, the court noted that, although the government had "persuasively respond[ed]" to the defendant's argument that he had left the United States a few years before he was indicted with the fact that the defendant had lived in the United States for many years and that, as a citizen, he should have understood that he had an obligation to return to stand trial," ultimately, it saw "'no reason to risk the possibility of error'"

by "parsing out [the defendant's] intent in leaving the jurisdiction, or the legitimacy of his attempts to stay there given the United States' failure to extradite him." *Id.* at 673, (*quoting United States v. Baccollo,* 5 F.2d 170, 172 (2d Cir. 1983)). The court emphasized, however, that, in reaching the merits, it did not "in any way suggest that the district court did err in finding that [the defendant] was a fugitive, or that it abused its discretion in applying the doctrine to him." *Id.* Instead, the court asserted, it relied "on the observation that '[t]he fugitive disentitlement doctrine stands for the proposition that those who flee from judicial process may not benefit from it,'" and noted its dismissal of the defendant's appeal for lack of jurisdiction ensured that defendant received no benefit. *Id.* at 673 n.7., *citing United States v. Bokhari,* 993 F.Supp.2d, 936, 938 (E.D. Wis. 2014).

The situation in *Bokhari* is substantially different from this case in multiple respects. First, there has been no determination by a foreign judge in Ahmed's extradition proceeding. And, as the *Bokhari* court noted, it was a "persuasive[ ] respon[se]" that Ahmed, similar to the defendant in *Bokhari*, was a U.S. citizen who lived in the United States for many years, including during the time period of the charged fraud, and who, as a citizen, well knew his obligation to stand trial. Indeed, after the indictment was returned in the Loretto 1 case, attorneys retained by Ahmed attempted to negotiate with the government conditions under which Ahmed might choose to return to United States. Indeed, significantly, the United States even signaled its willingness to accommodate Ahmed's requests to negotiate terms of release pending trial, after his return to the United States. But, even when faced with

18

accommodations that the defense agreed were fair, Ahmed chose to remain in a Serbian prison rather than enter the United States and be subject to this Court's jurisdiction.

Third, in *Gutierrez-Almazan v. Gonzalez*, 453 F.3d 956 (7th Cir. 2006), the defendant was ordered removed from the United States. 453 F.3d at 956. When the defendant filed a petition for review with the Seventh Circuit, the government moved to dismiss the petition under the fugitive disentitlement doctrine. *Id.* The court denied the government's motion to dismiss because the defendant had turned himself into immigration authorities and was taken into their custody. *Id.* at 957. As a result, the court found that the defendant was not a fugitive. *Id.* The court noted that, in cases where an escaped fugitive had been recaptured, courts have been reluctant "to impose the severe sanction of disentitling them to access to the federal courts." *Id.*

Indeed, the court cited the caution given by the Supreme Court in *Degen* that frequent use of fugitive dismissal "is too blunt an instrument for deterring other petitioners from absconding and for preserving the court's authority and dignity" and that "pragmatic considerations should guide courts' application of the doctrine." *Id.* The Seventh Circuit posited that the "essential question" to be considered was "have the petitioner's actions made the enforcement of an adverse judgment impossible?" *Id.* In *Guitierrez-Almazan* the answer was no because the defendant was in custody and the government would be able to remove the defendant if his appeal failed. Here, in stark contrast, Ahmed is not in the United States or in United States custody and

therefore is not subject yet to the jurisdiction of this Court nor he is subject to obeying this Court's orders.

## III.    CONCLUSION

The government respectfully requests that the Court apply the fugitive disentitlement doctrine in this case and deny without prejudice any request by Ahmed to file or to join in any motion to dismiss the indictment or any request to receive discovery in this case until such time as Ahmed is arraigned and subjects himself to the jurisdiction of this Court.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:    /s/ Diane MacArthur
DIANE MacARTHUR
KELLY GUZMAN
Assistant United States Attorneys
United States Attorney's Office
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 353-5300

Dated:       June 24, 2026